2023 IL App (1st) 220361-U

No. 1-22-0361

Order filed September 11, 2023

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 26145 |
| | ) | |
| GIOVANNI WEEMS, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We reverse the circuit court's order denying defendant leave to file a successive postconviction petition and remand for further proceedings, where defendant sufficiently stated a claim that newly discovered evidence of police abuse in the Area 2 police station corroborated his claim that he was coerced into confessing at that same police station.

¶ 2    Defendant Giovanni Weems appeals the circuit court's denial of leave to file a successive

petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West

2020)).[1] On appeal, he asserts that the circuit court erred in denying leave where he presented newly discovered evidence corroborating his longstanding claim that detectives at the Area 2 police station coerced him into confessing. We reverse and remand for further proceedings.

¶ 3    Defendant was charged with multiple offenses premised on an incident in Chicago on September 29, 2001, in which defendant was alleged to have killed Dawn Bramwell with a hammer and set fire to her house while her five children were inside.[2] Following a jury trial, defendant was found guilty of first degree murder, home invasion, aggravated arson, and five counts of attempted first degree murder. The trial court imposed natural life in prison for first degree murder and terms of years for the remaining counts.

¶ 4    Prior to trial, defendant filed a motion to suppress, alleging that any statements he made to detectives were not made voluntarily, knowingly, and intelligently. Rather, police interrogated defendant after he repeatedly requested an attorney, did not administer warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), inflicted physical, psychological, and mental coercion on defendant, and confronted defendant with material misrepresentations and "certain evidence" unconstitutionally obtained. Defendant identified the detectives who interrogated him as Detectives Kevin Gyrion, Daniel Judge, Michael Cummings, Daniel Gillespie, Thomas Downes,

---

[1] Defendant mislabeled his successive pleading seeking relief under the Act as a "petition for post-conviction relief" rather than as a motion seeking leave to file a successive petition. See *People v. Tidwell*, 236 Ill. 2d 150, 159 (2010) ("a successive postconviction petition will not be considered 'filed,' as that term is used in the [Act], until leave is granted"). Nevertheless, the circuit court could properly consider his pleading as a motion for leave to file a successive postconviction petition. See *People v. Sanders*, 2016 IL 118123, ¶ 25 ("the trial court may rule on a successive postconviction petition where leave to file has not been sought when documents submitted by a petitioner supply an adequate basis to determine whether the petitioner has sufficiently alleged cause and prejudice or actual innocence" (internal citations omitted)).

[2] Because Dawn Bramwell shares the same last name as her children, we refer to her and her children by their first names.

and Shaw, along with assistant State's attorney (ASA) Bronwyn Shaw.[3] The motion requested that the court suppress all communications, confessions, statements, admissions, gestures, and tests made by defendant, as they were elicited in violation of the fourth, fifth, and fourteenth amendments to the United States Constitution (U.S. Const., amends. IV, V, XIV) and the Illinois Constitution.

¶ 5    Defendant also filed a motion to quash arrest and suppress evidence, alleging he was arrested without a warrant or probable cause. Later, defendant filed an amended motion to suppress statements, identifying Detective Howley Star as an additional detective who interrogated him, and adding that he was not brought before a judge for a probable cause hearing within 48 hours of his arrest.

¶ 6    The court conducted a hearing on the motions. During the hearing, defendant recounted the circumstances of his arrest and conditions while being interrogated at the Area 2 police station, including being subjected to physical abuse and insulting remarks. Chicago police detectives Gillespie and Cummings also testified, denying the allegations of physical abuse, threats, and racial slurs.

¶ 7    The trial court granted defendant's motion to quash arrest, finding he was arrested without probable cause when police left him inside a locked room at the station overnight. However, the court denied defendant's motion to suppress statements, finding the testifying detectives were credible and defendant was not credible regarding his allegations of physical abuse. The court found that defendant was not physically abused and had been advised of the *Miranda* rights.

---

[3] The first name of Detective Shaw does not appear in the record on appeal. The record also shows an ASA named Bronwyn Sears.

¶ 8     At trial, Allen Bramwell testified that on September 28, 2001, he was 13 years old and living with his mother Dawn and four other children in a coach house at the 6900 block of South Dorchester Avenue. That night, he was awakened by smoke and escaped from the house with the other children. A certified fire and arson investigator also testified and opined that the fire was manmade and started with an open flame such as a match or a cigarette lighter.

¶ 9     Other testimony showed that, on September 30, 2001, Ellen Lee left her apartment located across the alley from defendant's building. Under a stairwell, Lee found keys and papers reflecting Dawn's name. On October 1, Lee took the items to the police station and led detectives to the location where she found the items. A claw hammer and Dawn's purse were found in a dumpster nearby. At the police station, detectives Gyrion and Cummings confronted defendant with photographs of the hammer and purse. Defendant replied, " 'You got me, you found the hammer in the garbage behind my house.' " According to Gyrion, defendant then admitted to killing Dawn and setting fire to the coach house. Gyrion received defendant's consent to retrieve from his apartment the jeans he had worn during the crimes.

¶ 10     ASA Bronwyn Sears testified that on October 2, at about 4:45 a.m., she spoke with defendant and he gave a videotaped statement, which was entered into evidence and published. In the statement, defendant admitted that he entered Dawn's bedroom and struck her with a hammer on her head and shoulder. He then went downstairs, poured gasoline on the basement steps, lit a fire near a smoke detector, and left through a basement door. Prior to the incident, defendant had taken Dawn's purse and keys, and placed her purse under a porch at his apartment building. After the incident, he retrieved the purse and threw it and the hammer into a dumpster. The State also submitted testimony showing that Dawn's DNA was found on the jeans recovered from

defendant's apartment. Blood was found between the two prongs of the claw hammer and on defendant's jeans.

¶ 11 Georgia Moore testified that she rented the coach house to Dawn. After the incident, she confronted defendant in a detective's vehicle outside Dawn's house regarding whether he killed Dawn. In response, defendant "looked over" and said, " 'I love her.' "

¶ 12 The medical examiner who performed Dawn's autopsy testified that Dawn had suffered a minimum of 38 blows to the head, 12 to the right arm, and 7 to other parts of the body. Her injuries were "quite consistent" with being inflicted by a claw hammer. The examiner did not find evidence that Dawn had ingested smoke. The examiner opined that Dawn died due to cranial blunt injuries, and her death was classified as a homicide.

¶ 13 Defendant called a material science consultant, who testified that he disagreed with the conclusion in a fire department report that arson was involved because "other causes," including an accident, were not ruled out.

¶ 14 Defendant testified that on September 28, 2001, sometime after 10 p.m., he went to the lakefront with Dawn and was dropped off near his house. Defendant sold drugs around the area, went home when the sun was still down, and stayed there. On the morning of September 29, 2001, police knocked on his door, entered his house, and asked about his whereabouts regarding an arson at Dawn's house. Officers searched his home without a warrant. Defendant agreed to go to the police station, but felt he did not have a choice.

¶ 15 At the station, officers placed defendant in an interrogation room, emptied his pockets, asked a couple more questions, and left. Defendant was locked in the interrogation room for days, was not allowed a telephone or given food, and was forced to urinate on the floor. One evening,

officers handcuffed him in a detective's vehicle and drove him to locate a man whom defendant said he contacted on the date of the incident. One officer spoke to the man and afterwards called defendant a "f***ing liar." Cummings slapped defendant, cursed at him, and pushed his head into an armrest. The officers then took defendant to a room in Dawn's house. They asked defendant about the crime and pushed him onto a bed, into a wet substance that the officers said was probably Dawn's blood.

¶ 16    On September 30, two white officers entered the interrogation room and told defendant they "don't like n***s." They would not allow him to call his mother or retrieve his attorney's phone number and told him he was not under arrest. Eventually, defendant agreed to give a buccal swab in exchange for food and for being released, but he was neither released nor given food. One officer hit defendant in the mouth with a folder, while another "butt [him] to the wall."

¶ 17    On October 1, Cummings and another detective drove defendant to Dawn's house again where he was confronted by Moore. Later, in the interrogation room, defendant was handcuffed and given food. That day, officers showed defendant "some papers" with Dawn's name on them, told him he "already knew what it was," showed him a photograph of a hammer and purse, and choked him while he was handcuffed to a ring on the wall. Defendant denied telling the officers "anything" or ever saying, " 'You got me. You got me. You found the hammer and the purse.' "

¶ 18    Defendant eventually agreed to make a video statement after the officers threatened to charge his mother for concealing evidence. He gave a statement about Dawn's death to the officer and an ASA, reciting police theories he had rehearsed with the officers beforehand. Defendant testified that a photograph of his face taken at the police station depicted a blood stain and cracked lip from when the officers hit him.

¶ 19    In rebuttal, the State called Cummings, who denied defendant's testimony regarding officer misconduct, including using racial slurs and slapping, choking, and threatening defendant.

¶ 20    Defendant was convicted of one count each of first degree murder, home invasion, and aggravated arson, and five counts of attempted first degree murder. The trial court imposed natural life in prison for first degree murder and terms of years for the remaining counts, some of which were ordered to run consecutively to the natural life sentence. On direct appeal, we modified the consecutive sentences to run concurrently, but otherwise affirmed. *People v. Weems*, No. 1-06-1882 (2009) (unpublished order under Illinois Supreme Court Rule 23).

¶ 21    On August 31, 2010, defendant filed a *pro se* postconviction petition, alleging, *inter alia*, that trial counsel provided ineffective assistance by failing to effectively pursue the motion to suppress defendant's confession, which was improperly obtained through a "pattern of *** abuse" by detectives. The circuit court summarily dismissed defendant's petition, and we affirmed. *People v. Weems*, 2012 IL App (1st) 110176.

¶ 22    On November 18, 2010, defendant filed a *pro se* motion for leave to file a successive postconviction petition, alleging, *inter alia*, ineffective assistance of trial counsel for failing to object to the admission of his confession into evidence at trial. He again alleged that he was coerced into confessing. On March 1, 2011, the circuit court entered an order denying defendant leave to file the successive petition. The record does not reflect that defendant appealed the order.

¶ 23    On April 11, 2017, defendant filed a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)), alleging he was unlawfully detained for over 48 hours without a probable cause hearing and trial counsel was ineffective for failing to raise that claim. The circuit court denied the petition. On appeal, we

permitted counsel to withdraw as counsel on appeal and affirmed. *People v. Weems*, No. 1-17-2951 (2019) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 24 On April 29, 2021, defendant filed the instant *pro se* successive postconviction petition alleging newly discovered evidence of systemic police misconduct, in which Area 2 detectives coerced false confessions. He alleged that on September 29, 2001, at 10 a.m., five Area 2 detectives apprehended him at his home without a warrant or probable cause and compelled him to go with them to the police station. Defendant was kept in custody until October 3, 2001.

¶ 25 Defendant claimed that the issue was not whether his confession was voluntary, but whether the outcome of the suppression hearing would have likely differed had the officers who denied harming defendant been impeached with evidence of their "pattern of abusive tactics *** in the interrogation of other suspects under similar circumstance[s]." He asserted that case law regarding postconviction relief based on newly discovered evidence of systemic police torture supported his earlier claims that his confession was coerced. He argued that, based on the newly discovered evidence of systemic abuse, he had "made a substantial showing of [a] prevailing pattern of police misconduct that could have resulted in his coerced confession and support[ed] his claim of actual innocence." He stated that "Illinois courts have consistently held that a 'pervasive pattern of criminal conduct by police officers' is enough for courts to reconsider the voluntariness" of a confession.

¶ 26 In addition to the successive postconviction petition, defendant filed a petition for relief from judgment also alleging that he was tortured into falsely confessing as a part of a pattern of torture by Area 2 detectives.

¶ 27    In the successive postconviction petition and petition for relief from judgment, defendant referenced various reports, studies, and cases. The supporting documents were listed in a separate "Exhibit List" filed the same day. Those exhibits include (1) a case disposition in which the Illinois Torture Inquiry and Relief Commission (Commission) found credible a claim of torture by Cummings in 1989; (2) a civil complaint alleging physical and verbal abuse by Chicago police detectives, including Cummings and Downes, in 2000; (3) a January 24, 2018, article reflecting that said civil complaint was settled; (4) a case disposition from the Commission finding John Mitchell's claim of torture by Cummings and other detectives in 2000 credible; (5) an interview report from the Federal Bureau of Investigation, which defendant stated was released on July 26, 2017, containing an ASA's account regarding Chicago police misconduct; (6) a September 1990 "special project conclusion report," sent from an investigator to the Office of Professional Standards, detailing systemic physical abuse and psychological torture at Area 2; (7) a law enforcement employee complaint history listing complaints received for Cummings and Judge; (8) excerpts of the United States Department of Justice's report of its investigation of the Chicago Police Department; and (9) excerpts from the hearing on defendant's pretrial motion to suppress statements.

¶ 28    On September 30, 2021, the circuit court entered an order denying defendant leave to file a successive postconviction petition and dismissing his petition for relief from judgment. As to the successive postconviction petition, the court found that defendant had satisfied the first prong of the cause-and-prejudice test, as the attached exhibits were not available when defendant litigated his motion to suppress statements in 2004, went to trial in 2005, and filed his first two postconviction petitions in 2010. However, the court found defendant could not show prejudice,

as the evidence of his guilt consisted of "much more" than his inculpatory statements and included physical evidence connecting him to the crime. The court also found the petition for relief from judgment was not a proper vehicle to raise a constitutional claim.

¶ 29    Defendant mailed a motion for leave to file a late notice of appeal on March 14, 2022, which this court allowed on March 28, 2022.

¶ 30    On appeal, defendant argues that the court erred in denying leave to file a successive postconviction petition, where he set forth a meritorious claim that newly discovered evidence corroborated his longstanding claim that he was coerced into falsely confessing while detained at the Area 2 police station.[4] The State asserts that defendant failed to set forth a clear claim of a constitutional violation because he did not allege that his confession resulted from physical coercion. To the extent that defendant adequately pled such a claim, however, the State concedes that the case should be remanded for second-stage proceedings.

¶ 31    The Act provides a three-stage mechanism for persons under criminal sentence to "assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Hodges*, 234 Ill. 2d 1, 9-10 (2009). Generally, the Act contemplates the filing of only one postconviction petition, and any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived. *People v. Orange*, 195 Ill. 2d 437, 449 (2001); 725 ILCS 5/122-3 (West 2020). However, the procedural bar against successive proceedings will be relaxed where (1) "the petitioner can establish cause and prejudice for the failure to assert a postconviction claim in an earlier proceeding," or (2) "the petitioner asserts a fundamental miscarriage of justice based on actual

---

[4] Defendant does not challenge the circuit court's dismissal of his petition for relief from judgment.

innocence." *People v. Robinson*, 2020 IL 123849, ¶ 42. Here, defendant asserts that he satisfied the cause-and-prejudice test.

¶ 32    The cause-and-prejudice test for a successive petition involves a higher standard than the frivolous and patently without merit standard that applies for evaluating initial postconviction petitions at the first stage. *People v. Smith*, 2014 IL 115946, ¶ 35. A person must establish cause "by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings." 725 ILCS 5/122-1(f)(1) (West 2020). A person establishes prejudice "by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f)(2) (West 2020). Both elements of the cause-and-prejudice test must be met to overcome section 122-3's waiver provision or to establish that fundamental fairness requires relaxing the *res judicata* doctrine. *People v. Clark*, 2023 IL 127273, ¶ 47.

¶ 33    In order to satisfy the cause-and-prejudice test, the defendant must "submit enough in the way of documentation" to allow a circuit court to determine whether the test was satisfied. (Internal quotation marks omitted.) *Smith*, 2014 IL 115946, ¶ 35. The circuit court should deny leave to file a successive petition "when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Id.* At the pleading stage of postconviction proceedings, including in ruling on a motion for leave to file a successive postconviction petition, "all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." *Robinson*, 2020 IL 123849, ¶ 45. "In deciding the legal sufficiency of a

postconviction petition, the court is precluded from making factual and credibility determinations." *Id.* Motions for leave to file a successive postconviction petition "are to be liberally construed," and a constitutional claim may be inferred from the motion and its attachments. *People v. Simms*, 2021 IL App (1st) 161067-B, ¶ 19; see also *People v. Duke*, 305 Ill. App. 3d 169, 172 (1999) (liberal construction is "normally given to *pro se* pleadings"). We review *de novo* the denial of leave to file a successive postconviction petition. *People v. Bailey*, 2017 IL 121450, ¶ 13.

¶ 34    The fifth amendment to the United States Constitution (U.S. Const., amend. V) "guarantees that no person shall be compelled to give evidence against himself, and so is violated whenever a truly coerced confession is introduced at trial, whether by way of impeachment or otherwise." *Kansas v. Ventris*, 556 U.S. 586, 590 (2009); see also *Ashcraft v. Tennessee*, 322 U.S. 143, 155 (1944) ("The Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession."). Moreover, "the pervasive pattern of criminal conduct by police officers at Area 2 has led courts to reconsider the voluntariness of alleged confessions in several prior cases, despite the *res judicata* effect of earlier decisions in those cases." *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 63. Courts "must play a significant role in ensuring that individuals are not wrongfully imprisoned as a result of" police misconduct. *People v. Jackson*, 2018 IL App (1st) 171773, ¶ 91. "[S]uccessive postconviction petitions are a proper tool for prisoners to raise previously unavailable evidence of police misconduct and to point out similarities between that conduct and what occurred in their cases, as such evidence becomes available." *Id.* "The [cause-and-prejudice] test is met when a defendant can connect specific misconduct resulting in his conviction to sufficiently similar misconduct by the same officer or officers." *Id.*

¶ 35 Liberally construing the allegations in defendant's *pro se* successive postconviction petition, we find defendant sufficiently stated a claim of a constitutional violation premised on a coerced confession. *Simms*, 2021 IL App (1st) 161067-B, ¶ 19. Defendant framed the issue as whether the outcome of his suppression hearing would have been different had the testimony of the police detectives, who denied defendant's allegations of misconduct, been impeached with newly discovered evidence revealing a pattern of abusive tactics employed during interrogations. He claimed that this new evidence "call[s] into question whether defendant's confession [was] in fact the product of physical coercion." He asserted that, based on the newly-discovered evidence, he had "made a substantial showing of [a] prevailing pattern of police misconduct that could have resulted in his coerced confession." Additionally, he cited systemic police torture case law to support his earlier claims that his confession was coerced, and referenced recent reports and studies describing claims of police abuse and torture by the same officers using similar tactics allegedly employed toward him.

¶ 36 Defendant did not artfully state that he was physically coerced into confessing by the Area 2 police detectives. Nonetheless, as demonstrated by the above allegations and supporting documentation, defendant's *pro se* pleading can be reasonably read as raising a claim that his confession was coerced in violation of his constitutional protections. See *People v. Weathers*, 2015 IL App (1st) 133264, ¶¶ 14, 22 (liberally construing the defendant's motion for leave to file a successive postconviction petition to find that, "while inartful," the motion alleged a due process violation where he alleged his confession was coerced, as corroborated by newly discovered evidence); see also *People v. Wrice*, 2012 IL 111860, ¶¶ 84-85 (finding a claim of coerced

confession due to physical abuse amounts to a violation of due process rights that is a cognizable constitutional claim under the Act).

¶ 37    Having concluded that defendant sufficiently set forth a claim of a constitutional violation, we agree with the parties that defendant satisfied the cause-and-prejudice test. As the circuit court correctly found, the documentation supporting defendant's successive postconviction petition was not available to him during his pretrial and trial proceedings, nor when defendant filed prior collateral challenges. See *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 162 (the defendant could not have discovered other alleged cases of abuse through due diligence, as "[m]any of these cases went through the court system over years and many of the allegations did not surface until many years later"); see also *People v. Patterson*, 192 Ill. 2d 93, 109 (2000) ("[B]eyond interviewing anyone who had ever been a prisoner at Area 2, we can conceive of no manner in which [defense counsel] reasonably could have obtained this information.").

¶ 38    Moreover, the use of a confession that "was the product of physical coercion by police officers at Area 2 headquarters" as substantive evidence of guilt at trial cannot be harmless error. *People v. Wrice*, 2012 IL 111860, ¶ 84. Thus, defendant's claim that he was coerced into confessing by Area 2 officers employing abusive tactics, along with the newly discovered evidence supporting his claim, is sufficient to establish prejudice at the leave-to-file stage regardless of the strength of the evidence at trial. *Id.* Accordingly, defendant met his burden and satisfied the cause-and-prejudice test required for the grant of leave to file his successive petition.

¶ 39    For the foregoing reasons, we reverse the circuit court's order denying defendant leave to file a successive postconviction petition and remand to the circuit court for appointment of postconviction counsel and second-stage postconviction proceedings. See *id.* ¶ 90.

¶ 40    Reversed and remanded.